UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


RONALD W. ROSS,

        Petitioner,

v.                                         Case No. 2:04-cv-168
                                         HON. ROBERT HOLMES BELL

LINDA METRISH,

        Respondent.
_____/


**OPINION AND ORDER APPROVING MAGISTRATE JUDGE'S**

**REPORT AND RECOMMENDATION**

The Court has reviewed the Report and Recommendation filed by the United States

Magistrate Judge in this action.  The Report and Recommendation was duly served on the parties.

The Court has received objections from the petitioner.  In accordance with 28 U.S.C. § 636(b)(1),

the Court has performed *de novo* consideration of those portions of the Report and Recommendation

to which objection has been made.  The Court now finds the objections to be without merit.

Petitioner first argues that the magistrate judge improperly relied upon the Michigan

Court of Appeals order affirmed by the Michigan Supreme Court denying petitioner's claims under

MCR 6.508(D) as a procedural bar.  The Sixth Circuit has recognized that the Michigan appellate

courts' reliance on MCR 6.508(D) in denying a petitioner's claim is a procedural bar in federal court.

*Howard v. Bouchard*, 405 F.3d 459 (6th Cir. 2005); *Bradly v. Birkett*, 192 Fed Appx. 468 (6th Cir.

2006).  "It is well-established in this circuit that the procedural bar set forth in Rule 6.508(D)

constitutes an adequate and independent ground on which the Michigan Supreme Court may rely in

foreclosing review of federal claims."   *Howard* at 477.   Nevertheless, as recognized in the

recommendation, to excuse the default the court must analyze the merits of the claims asserted to

determine whether it was constitutional error for appellate counsel to fail to raise the issues on direct

appeal.   Petitioner defaulted six of his seven claims presented in his petition.

      Petitioner argues that his trial attorney's failure to obtain a transcript of the

preliminary examination testimony rendered counsel ineffective in cross examining government

witness testimony that was inconsistent with testimony provided at the preliminary examination.

Petitioner relies on *Britt v. North Carolina*, 404 U.S. 226 (1971), for the proposition that an indigent

defendant is entitled to a copy of transcripts of a prior court proceeding when the transcripts are

needed for effective defense or appeal.   *See also United States v. Young*, 472 F.2d 628 (6th Cir.

1972).   Petitioner concedes that both counsel requested the transcript.   The record does not indicate

that the court denied petitioner the transcript.   However, petitioner did not have the transcript at the

time of trial and did not have the transcript at the time counsel prepared his appeal.   Petitioner did

have the transcript several months before the Michigan Court Appeals affirmed his conviction on

direct appeal.

      Petitioner argues that he could have successfully attacked the credibility of the hotel

maids who found incriminating evidence in the trash can in petitioner's hotel room.   Petitioner

argues that the testimony of sisters Mary Whiteloon and Lila Hoeksema was inconsistent and if his

counsel had been able to bring the inconsistencies to the attention of the jury, petitioner may have

been found innocent.   Specifically, petitioner argues:

> At trial Mary Whiteloon testified that it was she who found the bank
> bags in room #16 (TT vol. II pg 70) But at the preliminary
> examination Lila Hoeksema admits that it was she who found the
> bank bags in room #16.  (PET pg 89) Then at trial Ms. Hoeksema
> changes her story and says it was her sister who found the bags while

she was in the bathroom.  (TT vol III pg 143) At trial Ms. Whiteloon testified that she took two bank bags to the front desk clerk Peter Smith.  (TT vol II pg 72) Front Desk clerk Peter Smith testified that Ms. Whiteloon brought him only one bank bag.  (TT vol II pag 103) However at the preliminary examination Ms. Hoeksema admitted that it was she who took the bank bags to the front desk clerk Rusty Smith.  (PET pg 89-90)  However at trial Ms. Hoeksema changes her story and testified that she told her sister to take the bank bags to the front desk.  (TT vol III pg 143).

Mary Whiteloon testified at trial, in part, that:

> A.  I happened to find some bank books in the garbage.  I took them down to the office.
>
> Q.  What garbage?
>
> A.  At the hotel in the room I was in.
>
> Q.  Was it a room that you had entered to clean?
>
> A.  Yes.

Docket # 20 at 70.

> A.  I hold the bag up and, you know, you angle it, and I happened to see a white paper, and then I noticed the bank account things.  And I thought well, that's pretty cool because I wanted one to keep my bills in.  So I opened them up and I found two of them.  And I told my sister, "Hey, Lila, Look what I found."  And she said, "Well, what is it?  Look in there and see what's - - if there's anything in there."  So nosy old me opened it up and I found receipts from the Flight Deck for Aaron Whitley and a Betty somebody.
>
> Q.  Okay.
>
> A.  And I thought it was kind of funny because if you lose something like that, some people would want to - - want them back.  If I lost money orders, I'd want the receipts back.  So I - - she looked at them, and said, "Well, you better take them down there, and I told the guy that was on the - - was working - - I said, "Rusty, we happened to find these in Room 16."  And he says, "Well, what room?"  I said, "Room 16."  And I says, "If you take the checks up, can I have the bank - - the bank book?"  And he says, "Oh, okay," he says - - and so I went back up and did my work.

*Id.* at 71-72.  Desk clerk Peter Smith testified:

> Q.   Now, you've testified it was your recollection that Mary Whiteloon brought down at first one bag?
>
> A.  Yes.
>
> Q.  And how certain are you of that?
>
> A.  Well, I know she brought down the one bag.
>
> Q.  Okay.
>
> A.  I know there was another bag, but I don't - - I can't recall at the time that she brought it down right at the time.
>
> Q.  Are you certain that it came down separately at another time?
>
> A.  Well, it got to the police somehow, so I don't know if she brought it down or if she gave it to, you know, the police when they pulled up.
>
> Q.  Okay.
>
> A.  She brought down the one that had stuff in it.
>
> Q.  Okay.  So if she said she brought them both down at the same time, either your recollection's wrong or her recollection's wrong?
>
> A.   Well, I didn't really pay, you know, that much attention.  I grabbed the one that had stuff in it and looked and that's –

*Id*. at 103-104.  Lila Hoeksema testified:

> Q: And where in the room did you find them?  Or did you personally find them or did your sister?
>
> A.  My sister did.
>
> Q.  And were you - - do you recall where you were and what you were doing when Mary found those things?
>
> A.  I was in the bathroom.
>
> Q.  Were you in there and what - - tell me what happened.

> A. We would both walk in, and we'd pick up the garbage, pick up the sheets, the towels, put new ones in and we - -
>
> Q: And you were in the bathroom when your sister found some checks?
>
> A. Mm-hmm.

*Id.* at 143.  She further testified at trial:

> A. I told her to take them down to the office.

*Id.*  Petitioner asserts that this testimony is inconsistent with the testimony Lila Hoeksema gave at

the preliminary examination.  At the preliminary examination Lila Hoeksema testified:

> A. Yes, we found some bank notes.
>
> Q. Okay.
>
> A. And checks.
>
> Q. Okay.  And who were they made out to?  Do you remember?
>
> A. To the Flight Deck.
>
> Q. All right.
>
> A. And Paul Bunyan Lanes and Aaron - - Aaron Whitley.
>
> Q. Okay.
>
> A. And there was a lady.  I couldn't remember her name.
>
> Q. Did you find any bank bags in the room?
>
> A. Those were the two.

Docket #15 at 87.  Further, Lila Hoeksema testified that:

> A.  We looked at 'em and I told my sister to take them down to the
>
> office.
>
> Q.  Okay. And did she do that?
>
> A.  Yeah.

*Id.*  There is nothing inconsistent in this testimony.  However, petitioner argues that the inconsistency occurred based upon a statement made by petitioner's attorney at trial, just before asking Lila Hoeksema a question.  Petitioner's counsel asked:

> Q.  Okay.  You said that you found bank notes and checks.  Those
> were in the garbage can?
>
> A.  Yes.

*Id*. at 89.  What is clear, from a fair reading of the preliminary examination transcript, is that petitioner's counsel made an improper assumption prior to asking a question.  Lila Hoeksema did not testify that she was the first person to find the bank notes and checks.  Petitioner's counsel simply made that statement during the preliminary examination.  Nothing in the transcript could have been used at trial to successfully cross examine Lila Hoeksema on that issue.  Petitioner's counsel continued to assume facts not in evidence when he asked questions regarding what happened next. The testimony continued as follows:

> Q.  But it was readily, I mean - - - well, never mind.  When you took
> it to the front desk did you keep 'em in the bag?
> The white wrapper?
>
> A.  No.
>
> Q.  Okay. So you took 'em out of the wrapper and then took them to
> the desk?
>
> A.  Umm-hmm.  (Affirmative response).

Q. When you took them to the desk, who did you give that to?

A. Give it to Rocky Smith.

*Id*. at 89-90.

First, it is clear that Lila Hoeksema's testimony was not inconsistent. The only possible inconsistency in the testimony was in the statements made by petitioner's own attorney and in the manner he asked questions during the preliminary examination. Moreover, any assertion of inconsistency has no relevance to the testimony at trial. Who found the bank bags and who took the bank bags to the front desk has insignificant relevance at best. The important facts derived from the testimony are that the bank bags were found and that they were found in room number 16. Petitioner is not arguing that any inconsistent testimony existed on these issues. It is clear that petitioner's attorney did not err by failing to raise these issues on appeal.

Petitioner states that it was error for the magistrate judge to state that a credit card receipt for a pair of Work Force Boots were found in the trash can of the hotel room. Petitioner explains that the credit card receipt was found during the police search of the vehicle. The court will accept petitioner's correction on that issue. This fact, however, does not assist petitioner's argument.

Petitioner also focuses on the trial testimony of Martha Skeel by contrasting that testimony with her testimony at the preliminary examination. Martha Skeel testified that she brought coin wrappers to her place of employment, Alexanders, before the break-in. Some of the coin wrappers had her telephone number on them, and coin wrappers with Martha Skeel's telephone number were found in petitioner's car. Nevertheless, petitioner argues that if his counsel had the preliminary examination transcript at trial the inconsistencies could have been pointed out to the jury and a different result was likely.

At trial Martha Skeel testified:

Q.  Well, did it have anything to do with your grandchildren?

A.  Oh, yeah, my grandchildren had moved away, and their piggy banks, I forgot to send with them.  Grandmas have piggy banks.  So I cashed - - that's why I was doing it.  I was cashing in some change, and I was going to mail it to them.

Q. Okay.  And so you took some of it to the bank and you took some of it in to work?

A.  Right.

Q.  And that took place in the previous - - the week prior to the - -

A.  Yes.

Q. - - robbery?  Do you know exactly what day?

A.  No, I do not remember.

Q.  And do you know about how much it was?

A.  That I took totally between the bank and Alexander's?

Q.  Yeah.

A.  I think it was around 50-60.

Q.  Dollars?

A.  Mm-hmm.

Q.  Okay.  And did you put anything on any of the coin wrapper - - or was the change wrapped in a coin wrapper?

A.  Yes.

Q.  And did you put anything on any of the coin wrappers to  - -

A.  All the coins had my phone number on it.

Q.  I'm sorry?

A.  All the coins had my phone number on it.

Q.  Okay, and why is that?

A.  Because I didn't know exactly what I was going to need to leave to Alexander's and what I was going to take to the bank.  And the bank, to my knowledge, has always had you put your phone number on them.

Q.  Okay.  I'm going to hand you what I marked as Plaintiff's Proposed Exhibit 1, Ms. Skeel, and ask if you recognize it.

A.  Yes.

Q.  What is it?

A.  It's my phone number.

Q.  What is the object I just handed you?

A.  A roll of pennies.

Q.  And it's got your phone number - -

A.  Yes.

Q.  - - pencilled in on it?

A.  Yes.

Q.  Okay.  Is there any chance anybody else could have put that number on there?

A.  My phone number is unlisted.  I mean, no, I don't really think so.

Q.  And you had no connection to this case prior to being contacted by the police regarding that number, is that correct?

A.  Correct.

Q.  And do you have any connection at all to the Defendant in any way?

A.  No.

Docket #19 at 161-163.

Petitioner argues that at the preliminary examination Martha Skeel's testimony was so significantly different that if pointed out at trial he would have been found innocent.  At the preliminary examination Martha Skeel testified:

> Q.  Now you mentioned that you had these rolls there from your tips?
>
> A.  Well, because sometimes we don't cash our tips in, we take them home and then after awhile you get a bunch and then you roll them up and you take them to the bank.
>
> Q.  Okay.
>
> A.  Or wherever.  You know.  I just know that we needed cash flow so I had taken some in there.
>
> Q.  Okay.  Now you took these to your place of employment at the time?
>
> A.  Right.

Docket # 15 at 14.  She further testified:

> Q.  All right.  And what day was this, again, We're talking about?
>
> A.  Oh, what day of the week?  I would think it would have been Friday or Saturday.  'Cause it - -  -I think was Friday.  Because I do believe Saturday I knew I couldn't get to the bank . . . .
>
> Q.  And you placed the phone number on each roll that you brought in?
>
> A.  Yes, I did.
>
> Q.  Did you place the phone number on the rolls that you brought to the bank?
>
> A.  Yes, I did.
>
> Q.  Do you have any idea for the total number of rolls that you had? How many you left at Alexander's and how many you took to the bank?

> A.  I took a lot to the bank.  Because I had a couple hundred dollars worth of change.

*Id.* at 14-15.  Mary Skeel stated:

> Q.  Miss. Skeel, the morning, er, did you go in on the morning of the 19th, after it was broken into?
>
> A.  Yes.  I got a phone call and I went in.

*Id.* at 16.

It is clear that counsel did not err by failing to raise petitioner's asserted differences between Mary Skeel's preliminary examination testimony and trial testimony.  Importantly, Mary Skeel testified that she brought wrapped coins to work with her telephone number written on the wrapper.  There was nothing inconsistent about her testimony concerning this fact.  Moreover, petitioner has not explained how the wrappers with Mary Skeel's telephone number got into his automobile.  Petitioner's counsel clearly did not err by failing to raise the asserted issues at trial or on appeal.

Similarly, petitioner also defaulted his claim regarding the seized money that was returned to one of the crime victims.  Petitioner argues that he was not allowed to use the money as evidence in this case and never had the opportunity to identify the money.  More specifically petitioner argues:

> One can hardly think of a more favorable form of exculpatory evidence than for the defense to be able to lay the money that the prosecution was alleging the defendant stole, out in front of the person it was allegedly stolen from and have him admit that this is not the same money that was stole from him.  Then have the defendant identify the money by several distinguishing marks, as well as a certain amount being new with many of the serial numbers in sequential order.  The likelihood that this action would have an effect on the jury's decision making is plain.

There was no objection at trial regarding the admission of the control form involving the stolen money.  Petitioner's argument is clearly speculative at best.  It was not error for petitioner's trial counsel or appellate counsel to not raise this issue.

Finally, it is clear that issues raised by petitioner regarding the search of his vehicle are foreclosed from consideration in this court under *Stone v. Powell*, 428 U.S. 465 (1976).  Further, petitioner's assertion of cumulative error lacks any factual basis.  Nor has petitioner shown any prosecutorial error.  Most importantly, petitioner has failed to establish that the Michigan courts' decisions resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

THEREFORE, IT IS ORDERED that the Report and Recommendation of the Magistrate Judge is approved and adopted as the opinion of the court.


Date:      March 26, 2007                      /s/ Robert Holmes Bell
                                               ROBERT HOLMES BELL
                                               CHIEF UNITED STATES DISTRICT JUDGE